

FILED

AUG 1 5 2003

CLERK, U.S. DISTRICT COURT
WESTERN DIST...
BY _____

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| ADAPT of TEXAS, BOB KAFKA, FREDDY GONZALEZ, J.T. TEMPLETON, KAREN GREEBON, CAROLYN WILSON, MANDY CASTILLO, and RANDY DOANE, | § § § § | |
| Plaintiffs | § | |
| v. | § § | CIVIL ACTION NO. |
| TEXAS SPEAKER OF THE HOUSE, TEXAS SECRETARY OF THE SENATE, REPRESENTATIVE JOHN SMITHEE, and TEXAS DEPARTMENT OF PUBLIC SAFETY, | § § § § § § | A 03CA 517 SS |
| Defendants | § | |

## FIRST AMENDED COMPLAINT

Plaintiffs bring the following claims against the above-named Defendants, and allege:

### STATEMENT OF CLAIMS

1.  Plaintiffs complain of Defendants for violations of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131-12134 (as it pertains to all Defendants); Section 504 of the 1973 Rehabilitation Act ("Section 504"), 29 U.S.C. § 794 (as it pertains to all Defendants); Chapter 121 of the Texas Human Resources Code ("Chapter 121") (as it pertains to Defendants Speaker, Secretary, and Department of Pubic Safety ("DPS")); and Article 9102 of the Texas Revised Civil Statutes ("Article 9102") (as it pertains to Defendants Speaker, Secretary, and DPS).

2.  This civil action seeks injunctive and declaratory relief, damages, and attorney's fees, litigation expenses, and costs directly resulting from the discriminatory treatment of Plaintiffs.

### JURISDICTION AND VENUE

3.  This action is brought pursuant to Title II of the ADA, Section 504, Chapter 121, and Article 9102. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 2201, and the federal statutory provisions cited above. Plaintiffs further invoke the supplemental jurisdiction of this

5

Court, pursuant to 28 U.S.C. § 1367(a), to consider their state law claims.

4. Venue is proper in this Court, pursuant to 28 U.S.C. §1391(b), as the events complained of occurred within this district and division.

## PARTIES

5. Plaintiff ADAPT of Texas ("ADAPT") is a statewide grassroots disability rights group based in Austin that promotes the elimination of attitudinal and physical barriers faced by persons with disabilities. Many of the group's members, which includes each of the following Plaintiff individuals, are, like the Plaintiff individuals, a "qualified individual with a disability" within the meaning of the ADA Title II, meet the definition of "handicapped" under 29 U.S.C. § 706(7), are a "person with a disability" within the meaning of Chapter 121, and have a "disability" under Article 9102. ADAPT brings suit in its representational capacity for such members, included here under "Plaintiffs."

6. Plaintiff Bob Kafka is a resident of Austin and uses a wheelchair for mobility.

7. Plaintiff Freddy Gonzalez is a resident of Austin. He uses a walker to assist in mobility and also has limited memory, both a result of brain injury.

8. Plaintiff J.T. Templeton is a resident of Austin, and uses a wheelchair for mobility.

9. Plaintiff Karen Greebon is a resident of Austin, and uses a wheelchair for mobility.

10. Plaintiff Carolyn Wilson is a resident of Austin. She is hard of hearing, functionally deaf, and relies on visual orientation to communicate.

11. Plaintiff Mandy Castillo is a resident of Austin. She is deaf and relies on certified interpreters to gain access to effective communication.

12. Plaintiff Randy Doane is a resident of Austin. He is deaf and relies on certified interpreters to gain access to effective communication. He also has mental illness, such as

depression and post traumatic stress disorder.

13.  Defendant Speaker of the House ("Speaker") is the entity responsible for the Texas House of Representatives.  Defendant has a legal duty to ensure that the House of Representatives does not discriminate against individuals with disabilities.  Defendant is a public entity within the meaning of Title II, and a recipient of federal funding for purposes of Section 504.  The Speaker may be served process by serving Tom Craddick, at his Capitol Office, 1400 Congress Avenue, Room 2W.13, Austin, TX 78701.

14.  Defendant Secretary of the Senate ("Secretary") is the entity responsible for the Texas Senate.  Defendant has a legal duty to ensure that the Senate does not discriminate against individuals with disabilities.  Defendant is a public entity within the meaning of Title II, and a recipient of federal funding for purposes of Section 504.  The Secretary may be served process by serving Patsy Spaw, at her Capitol office, 1400 Congress Avenue, Room 2E.22, Austin, TX 78701.

15. Defendant Representative John Smithee ("Smithee"), in his official capacity as the Chair of the House Insurance Committee, has a legal duty to ensure that the Committee does not discriminate against people with disabilities. Defendant is a public entity within the meaning of Title II, and a recipient of federal funding for purposes of Section 504.  John Smithee may be served process at his Capitol office, 1400 Congress Avenue, Room 1W.11, Austin, TX 78701.

16.  Defendant Texas Department of Public Safety ("DPS") is the entity responsible for the Capitol Police.  Defendant has a legal duty to ensure that the Capitol Police do not discriminate against individuals with disabilities.  Defendant is a public entity within the meaning of Title II, and a recipient of federal funding for purposes of Section 504.  DPS may be served process by serving Phil Adkins, at the DPS office of General Counsel, 5805 N. Lamar, Building A, Austin, TX 78752.

## STATEMENT OF FACTS

17. Under Title II of the ADA, public entities are forbidden from discriminating against people with disabilities. 42 U.S.C. §§ 12131-12134.

18. This prohibition applies to all state and local government agencies, including courts, legislatures, commissions and councils, and state/county/city departments and agencies of all kinds. 42 U.S.C. §§ 12131-12134.

### SENATE FINANCE COMMITTEE HEARING ON MARCH 20, 2003

19. On or about March 20, the Senate Finance Committee held a budget workgroup that was open to public observation and was well attended.

20. As a result of the large turn-out, a sergeant-at-arms was directing the flow of traffic into the workgroup room.

21. The sergeant-at-arms refused to allow Plaintiffs Templeton and Greebon, who both use electric wheelchairs, in the workgroup room because they take up too much space and were thus a "fire hazard."

22. After refusing entrance to Mr. Templeton and Ms. Greebon, the sergeant-at-arms proceeded to allow non-disabled individuals into the workgroup room, thus blatantly discriminating against them and preventing them from participating in the legislative process.

23. When Mr. Templeton and Ms. Greebon suggested to the sergeant-at-arms that the workgroup be moved to a larger room, where they too would be able to participate, the sergeant-at-arms refused to accommodate them.

24. As a result, Mr. Templeton and Ms. Greebon were denied access on the basis of their disability to contribute to the Senate Finance workgroup.

HOUSE APPROPRIATIONS COMMITTEE HEARING ON MARCH 30, 2003

25.  On or about March 30, the House Appropriations Committee held a hearing on the budget for the Department of Human Services which provides many programs for people with disabilities.

26.  The hearing was well attended, and there were not enough seats available for the people in attendance.  As a result, many people were standing in the aisles.

27.  Plaintiff Gonzalez, who uses a walker to assist with mobility, was unable to acquire a seat.  As a result, he placed his walker in the aisle, to the side, and sat on the platform attached to his walker.

28.  A Capitol police officer then approached Mr. Gonzalez and informed him that he would have to leave because it was a fire hazard for him to be in the aisle.

29.  The officer did not single out or force any able-bodied attendees who were standing in the aisles to leave.

30.  By way of his discriminatory actions, the Capitol police officer refused Mr. Gonzalez access to attend and participate in the hearing on the basis of his disability.

HOUSE APPROPRIATIONS COMMITTEE MEETING ON APRIL 2, 2002

31.  On April 2, 2003, the House Appropriations Committee held a hearing at which issues pertinent to individuals who are blind and organizations that advocate for persons who are blind were on the agenda.

32.  Despite the content of the hearing, the Committee failed to provide the agenda on alternate formats for the blind.

33.  The Committee considered the inclusion of people who are blind as less important than the other attendees and, as a result, attendees who were blind or visually impaired were unable to

participate to the extent of their non-disabled peers.

34. The Committee thus displayed a complete lack of regard for constituents directly affected by the proposed legislation being considered, which is not only discriminatory on the basis of disability, but also disturbingly narrow-minded.

### HOUSE INSURANCE OOMMITTEE MEETING ON APRIL 7, 2003

35. On April 7, 2003, the House Insurance Committee held a televised hearing at which three mental health insurance bills were presented, House Bill (HB) 690, HB 1558, and HB 1880.

36. During the televised public testimony, an individual who was testifying against the bills began to read from the DSM IV, a diagnostic tool used by psychiatrists. She then proceeded to make fun of the symptoms used to diagnose different mental illnesses, and to laugh at people with such mental illnesses.

37. The Committee members, including Committee Chair Smithee, laughed uproariously at the plight of persons with mental illnesses and contributed to the jokes being made.

38. Smithee, instead of putting an end to this behavior, allowed the testimony to continue for several minutes during which time he found the disabling mental conditions with which people in the community live as entertaining, and even participated in the inappropriate conduct.

39. This behavior continued until the sponsor of the bills, Representative Garnett Coleman, who had been watching the testimony from his office, ran into the hearing room. Coleman was so concerned about the detrimental effect the testimony and Committee reaction was having on people with mental disabilities, he demanded the bills be pulled from consideration despite the fact that these bills, if passed, would provide greater access to insurance for people with mental disabilities.

40. The government and its representatives have a unique capacity to influence societal prejudices and false beliefs and to teach and create discriminatory attitudes.

41. Taken together, the provisions of Title II of the ADA are "intended to prohibit exclusion and segregation of individuals with disabilities and the denial of equal opportunities enjoyed by others, based on, among other things, presumptions, patronizing attitudes, fears, and stereotypes about individuals with disabilities." 29 C.F.R §35.130.

42. Further, "public entities are required to ensure that their actions are based on facts applicable to individuals and not on presumptions as to what a class of individuals with disabilities can or cannot do." 29 C.F.R §35.130.

43. The result of this display of presumptions and patronizing attitudes which was available for everyone in the state to witness undercuts the entire purpose of the ADA and other laws which seek to eliminate discrimination against individuals with disabilities and to establish clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities. 42 U.S.C. § 12101(a)(1)-(2).

SENATE FINANCE COMMITTEE HEARING ON APRIL 11, 2003

44. On April 11, 2003, the Senate Finance Committee held a hearing regarding appropriations for several state agencies. These agencies and individuals testifying on their behalf were invited to present information regarding their fiscal needs.

45. The Senate Finance Committee was unwilling to provide interpreter services for the duration of the hearing, and desired to pinpoint exactly when individuals who are deaf and hard of hearing would be testifying.

46. As a result, prior to the hearing, the Senate Finance Committee requested that the Texas Commission for the Deaf and Hard of Hearing (TCDHH) attend at a separate time than the rest of the agencies on the agenda (on April 14 instead of April 11) to discuss the issues relating to TCDHH.

47. As a result of this request, no one representing the interests of TCDHH attended the

hearing on April 11. Had anyone who is deaf been present, including the Executive Director of TCDHH, they would have been completely unable to communicate and/or participate in the hearing.

48. At the regularly scheduled hearing on April 11, the other agencies on the agenda finished early, and the only agency left for discussion was TCDHH. At this time, Senator Nelson said there had been a problem, that there needed to be an interpreter when TCDHH was discussed, so she had asked them to postpone their segment of the hearing until a time certain on Monday, April 14, when they would have an interpreter available.

49. Senator Teel Bivins, the Chair of the Senate Finance Committee then stated "What I thought we might do...I don't think they would mind if we went ahead and heard your [Senator Nelson's] report...but we will certainly allow that time on Monday for them to come in."

50. A few items were then mentioned briefly, at which time Senator Bivins concluded by stating, "Communicate with the agency that they are welcome here...and let the record reflect that one of the reasons we didn't want them to come in today is because we would have to pay the interpreters ... we're very cognizant of money ... so we could limit exposure on those costs."

51. The Senate Finance Committee then cancelled the second part of the hearing that had been scheduled with TCDHH for Monday.

52. As a result, TCDHH and members of the deaf community, including Plaintiffs Castillo and Doane, who are deaf, were discriminated against, on the basis of disability. They were told not to come until Monday in order for the Committee to save money, and then they were never given an opportunity to present public testimony or to inform the legislators on issues pertinent to the deaf population that the legislators would otherwise know nothing about.

SENATE FINANCE COMMITTEE MEETING ON MAY 22, 2003

53. On May 22, 2003, the Senate Finance Committee held a hearing on HB 2292 where the

possibility of combining state agencies such as the Texas Commission of the Deaf and Hard of Hearing, the Texas Rehabilitation Commission, and the Texas Commission for the Blind into a single agency was to be discussed.

54. This consolidation of state agencies was opposed by many individuals and organizations in the deaf community, including Plaintiff Wilson, who is functionally deaf, as it would mean a less visible agency to pursue the interests of people who are deaf and hard of hearing, and a loss of a board and other leaders in the agency that are deaf or hard of hearing and thus have invaluable insight into the needs and concerns of that population.

55. Due to the very real impact such a House Bill would have on Ms. Wilson, she had an intense motivation to participate as fully as possible in the legislative process concerning HB 2292.

56. Upon arrival to the hearing room on May 22, Ms. Wilson discovered the doors were still locked and many other individuals were standing outside of the hearing room.  Among these individuals were other people she knew to be deaf or hard of hearing, and people with physical disabilities including a man using a cane and appeared to be having much difficulty in standing.

57. Although there was one bench outside of the hearing, which people waiting to gain entrance were using, there was no other available seating anymore within vision of the hearing room.

58. There were, however, other benches around the corner, not being utilized, and Ms. Wilson asked a DPS officer if a bench could be moved for these individuals with disabilities.

59. The DPS officer refused to accommodate Ms. Wilson or any of the other individuals with disabilities and would not let them bring over any additional seating.

60. The officer then suggested that the individuals go to the cafeteria to wait for the hearing to begin. This suggestion ignored the fact that moving to the cafeteria would be extremely difficult for those with mobility impairments who had difficulty in walking long distances, and that by

removing themselves, people who were deaf or hard of hearing would have no way of discovering when the hearing was to begin.

61. As a result, for fear of missing their opportunity to oppose HB 2292, people with various disabilities were left with no choice but to stand outside the hearing room.

62. When the hearing did finally begin, Ms. Wilson was pleased to discover that accommodations for CART had been arranged, allowing her to read the testimony and other communications on a screen at the front of the hearing room.

63. This excitement soon faded to disappointment however, when Ms. Wilson realized that the CART provisions had not been set up to be continuous, and she was only able to understand what was being said in the hearing room a part of the time.

64. As a result of this failure to provide continuous accommodations for Ms. Wilson and other individuals who rely on CART, Defendants forced Ms. Wilson into isolation and deprived her of the ability to understand what was being said in the hearing room.

65. In addition, at the hearing on May 22, and at many other House Appropriations and Senate Finance Committee hearings which were scheduled at the last minute, Ms. Wilson would arrive not knowing if she would be able to understand what was being said, if she would be able to know when her name was being called to testify, if she would know when her time to speak had run out when testifying, and, if CART was available, if she would even be able to see the small television sitting at the front of the crowded hearing room.

66. The presence and validity of these many concerns regarding Ms. Wilson's ability to communicate effectively at House and Senate Committee hearings demonstrate the ineffectiveness of the provisions made by Defendants and the stressful, confusing, and isolated position this forces onto individuals with disabilities who would otherwise participate fully in the legislative process.

<u>INTERPRETER SERVICES</u>

67. During the regular session of the 78th Legislature, the House Appropriations Committee held a hearing on House Bill 2292 which includes a provision to reorganize and consolidate the health and human service agencies, including state agencies such as the Commission of the Deaf and Hard of Hearing, the Rehabilitation Commission, and the Commission for the Blind.

68. At this hearing, the Chair requested that all of the people needing interpreter services in order to testify go ahead and do so even though they hadn't even completed setting out the bill.

69. Despite the fact that it was clearly not the appropriate time to testify and certainly not in line with the typical order of events at a bill hearing, the Committee admittedly wanted to send the interpreters home as soon as possible to save money.

70. As a result, not only did the Appropriations Committee force people who were relying on the interpreter to inappropriately present their testimony, but the Committee prevented attendees who are deaf from participating in any other aspects of that hearing once the interpreters left.

71. Attendees who rely on such interpreter services were unable to interact with their surroundings, were unable to know what was being said in other testimony, and were therefore unable to fully represent their interests.

72. Although it is a common occurrence at bill hearings for individuals who did not originally intend to testify to decide to do so on the basis of other testimony or reactions of the legislators, the Committee denied that opportunity to deaf people who rely on ASL to communicate once the interpreters were sent home.

73. This action by the Appropriations Committee of singling out of the attendees who were deaf was not only discriminatory on the basis of disability, but prevented them from impacting the decisions being made regarding the consolidation of agencies in which they had an important interest.

HEARING ROOM ACCESSIBILITY

74. Prior to a Department of Human Services budget hearing about funding for services for people with disabilities, Plaintiff Kafka requested accommodations in the hearing room that would enable people who use wheelchairs to present testimony in an integrated, accessible setting.

75. As a result of Mr. Kafka's requests, the table at the front of the hearing room, used by individuals who are testifying, was placed on blocks in order to make it accessible for people who use wheelchairs.

76. The following day, Mr. Kafka was attending a different hearing in the same meeting room, and the blocks had been removed. As a result, the table was no longer accessible to people using wheelchairs. This results in illegal barriers as follows:

    (a) The tables at the front of the hearing rooms lack clear floor space. This violates §4.32.2 of ADAAG[1] and TAS,[2] which require that seating spaces for people in wheelchairs which are provided at fixed tables or counters have clear floor space complying with §4.2.4, which includes a minimum clear floor space of 30 inches by 48 inches for a single stationary occupant, and that it must not overlap knee space by more than 19 inches.

    (b) The tables at the front of the hearing rooms do not have appropriate knee clearance. This violates §4.32.3 of ADAAG and TAS, which require knee spaces to be at least 27 inches high, 30 inches wide, and 19 in deep be provided if seating for people in wheelchairs is provided at tables.

    (c) The tables at the front of the hearing rooms are not the appropriate height for a person using a wheelchair. This violates §4.32.4 of ADAAG and TAS, which require the tops of accessible tables be from 28 inches to 34 inches above the finish floor or ground.

---

[1] The ADA Accessibility Guidelines (ADAAG) are found at 28 C.F.R. Ch., Pt.36, App.A. The Architectural and Transportation Barriers Compliance Board is empowered by the ADA to issue guidelines "to ensure that buildings, facilities, rail passenger cars, and vehicles are accessible, in terms of architecture and design, transportation, and communication, to individuals with disabilities." 42 U.S.C. § 12204(a), (b). These guidelines are the ADAAG. The Department of Justice has adopted them as its Standards for Accessible Design, pursuant to 42 U.S.C. § 12186(b).

[2] The Texas Accessibility Standards ("TAS"), adopted in 1993, parallel the ADAAG guidelines *seriatim* in all respects with regard to the matters covered in this lawsuit.

77. When the House and Senate construe accommodations for people with disabilities on such a narrow and short-term basis, they ignore the reality that people with disabilities are members of the community who have concerns and interests in widely varying issues, and can arrive to testify for any hearing on any given day of the week.

ACCESSIBLE PARKING

78. The handicapped parking spaces within the "drive" of the capitol have all been removed, and have been changed to parking for legislators.

79. The "drive" located at the north side of the Reagan Building has been closed off, thus denying people with disabilities access to the handicapped parking spots for that building.

80. Not only have so many of the handicapped parking spaces been removed, these spaces have not been relocated.

81. To meet the parking demand, the Visitor's Parking Garage is relied upon. However, this parking garage is at least two city blocks from the accessible entrance to the Capitol. In addition, the changes discussed herein result in a deficiency of accessible parking spaces for the Capitol. These result in illegal barriers as follows:

(a) violation of §4.6.2 of ADAAG and TAS, which require accessible parking spaces serving a particular building to be located on the shortest accessible route of travel from adjacent parking to an accessible entrance. In addition, it states that for parking facilities that do not serve a particular building, accessible parking shall be located on the shortest accessible route of travel to an accessible pedestrian entrance of the parking facility;

(b) violation of §4.1.2 of ADAAG and TAS, which detail minimum requirements as to the amount of accessible parking spaces a building must have; and,

(c) violation of §4.6.1 of ADAAG and TAS, which require certain specifications for the minimum number of parking spaces required to be accessible by §4.1.

ACCESSIBLE ENTRANCE TO CAPITOL BUILDING

82. There is one main entrance into the Capitol that is accessible for people with disabilities,

on the north side of the building.

83.  This accessible entrance is sometimes closed and locked during business hours, thus denying access for people with disabilities to the Capitol during these times.

84.  Further, bill hearings during the session routinely continue late into the night, and begin early in the morning, during which times not all doors remain unlocked.  Defendants Speaker, Secretary, and DPS do not keep the accessible entrance open during all of these times.

85.  For example, Plaintiff Kafka arrived at the Capitol on a Saturday morning for a 7:00 am hearing for the House Appropriations Committee regarding funding for services and programs for people with disabilities.

86.  At this time, other entrances to the Capitol had been unlocked, however, the north entrance remained locked.

87.  Mr. Kafka and other people with disabilities who were planning on attending the hearing had to wait outside until someone with a key happened to walk by and let them in.

88.  As a result of this lack of planning in ensuring access to the hearing, Mr. Kafka and other people with disabilities who were planning on attending the hearing were late in arriving to the hearing room.

89.  These facts regarding entrance into the Capitol by people with disabilities result in illegal barriers as follows:

  (a)  violation of §4.1.2 of ADAAG and TAS, which require at least one accessible route complying with §4.3 to be provided within the boundary of the site from public transportation stops, accessible parking spaces, passenger loading zones if provided, and public streets or sidewalks, to an accessible building entrance; and,

  (b)  violation of §4.14.1 of ADAAG and TAS, which states that entrances required to be accessible by §4.1 must be part of an accessible route complying with §4.3 and must be connected by an accessible route to public transportation stops, to accessible parking and passenger loading zones, and to public streets or sidewalks if available (see §4.3.2(1)).

CAUSES OF ACTION

I. <u>Violation of Title II of ADA</u>

90. In passing the ADA, Congress identified some 43,000,000 Americans as having one or more disabilities and found that discrimination against individuals with disabilities continues to be a serious and pervasive social problem.  *See* 42 U.S.C. § 12101(a)(1)-(2).

91. Congress found that, historically, society tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem. *See* 42 U.S.C. § 12101(a)(2).

92. Among its stated purposes, the ADA has a clear and comprehensive national mandate to eliminate discrimination against individuals with disabilities and to establish clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities. 42 U.S.C. § 12101(a)(1)-(2).

93. Title II of the ADA, governing state and local governmental entities, protects persons from  discrimination on the basis of disability by public entities.  42 U.S.C. §§ 12131-12134; 28 C.F.R. Part 35 § 35.101 *et seq.*

94. Title II defines "public entity" in pertinent part as "(1) any state or local government; (2) any department, agency, special purpose district, or other instrumentality of a State or ... local government ...." 42 U.S.C. § 12131(1)(a); 29 C.F.R. § 35.104.

95. Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity or be subject to discrimination by any [public] entity."  42 U.S.C. § 12132.

96. Taken together, the provisions of Title II of the ADA are "intended to prohibit exclusion

and segregation of individuals with disabilities and the denial of equal opportunities enjoyed by others, based on, among other things, presumptions, patronizing attitudes, fears, and stereotypes about individuals with disabilities." 29 C.F.R §35.130.

97.  Further, "public entities are required to ensure that their actions are based on facts applicable to individuals and not on presumptions as to what a class of individuals with disabilities can or cannot do." 29 C.F.R §35.130.

98.  In addition, the ADA Accessibility Guidelines ("ADAAG") establish the standards to which public accommodations must conform in order to comply with the ADA.  28 C.F.R. Ch., Pt.36, App.A.

99.  The Capitol qualifies as a historical building.  Alterations to historic properties must comply with the historic property provisions of ADAAG (4.1.7).  28 C.F.R. § 36.405(b).  The term "alteration" includes historic restoration.  28 C.F.R. § 36, App. A.  The historic property provisions are alternative standards to be followed when adherence to the usual standards would threaten or destroy the historic significance of a feature of the building.  28 C.F.R. § 35.151(d).  The Capitol fails to meet even these alternative minimum standards with regard to the violations complained of in this suit.

100.  Defendants Speaker, Secretary, and DPS have violated the above-mentioned sections of ADAAG,  pertaining to table accessibility, the location of parking, and the availability of an accessible route, thus denying physical and program access to the Capitol.

101.  Defendants' failed to make the Capitol readily accessible to and usable, absent of discrimination,  by individuals with disabilities as described above, in violation of Title II of the ADA and federal regulations implementing Title II.

## II. Violation of Section 504

102. Section 504 states, "No [person] shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subject to discrimination under any program or activity receiving federal funding assistance." 29 U.S.C. § 794(a).

103. Defendants are publicly funded and are recipients of federal funding, and therefore, fall within the ambit of Section 504.

104. Defendants' violations, as described above, violate the rights of Plaintiffs that are secured by Section 504, by discriminating against individuals with disabilities on the basis of disability. 29 U.S.C. § 794.

## III. Violation of Chapter 121 and Article 9102

105. Article 9102 (the Texas Architectural Barriers Act) was adopted to further the policy of the State of Texas to eliminate discrimination against, and promote the equal treatment of, persons with disabilities, and in order to make buildings accessible to, and functional, for such persons.

106. Article 9102 applies to publicly funded buildings or facilities, constructed or substantially renovated, modified, or altered on or after January 1, 1970. Tex.Rev.Civ.Stat.Ann. art. 9102, §2(a)(1).

107. Pursuant to legislative mandate in Section 5(c) of Article 9102, the Texas Department of Licensing and Regulation adopted the Texas Accessibility Standards ("TAS") to be the minimum standards for compliance with Article 9102, and therefore Chapter 121. Modeled after ADAAG, the goal of TAS is to encapsulate the requirements of public facilities necessary to meet state standards of accessibility. Defendant's violations of ADAAG represent violations of the ADA, while violations of TAS represent violations of Art. 9102.

108. Defendants have violated the above-mentioned sections of TAS, pertaining to table

accessibility, the location of parking, and the availability of an accessible route, thus denying physical and program access to the Capitol.

109.  Defendant's failure to make the Capitol equally accessible has denied, and continues to deny, Plaintiffs and others similarly situated, due to their disabilities, the same rights that able-bodied persons have to the full use and enjoyment of that public facility, in violation of the Texas Human Resources Code §121.003(a).

110.  The discrimination prohibited by Chapter 121 includes a failure to comply with Article 9102. Tex.Hum.Res. Code §121.003(d)(1).  Each violation of TAS is therefore a separate violation of Chapter 121.

111.  In discriminating against people with disabilities and preventing physical and program access to the Capitol, by singling out people with disabilities and refusing their entrance into public hearings and workgroups and forcing them to leave public hearings, Defendants Speaker, Secretary, and DPS have failed to comply with the Tex.Hum.Res. Code §121.003(d)(2), which requires reasonable accommodations in policies, practices, and procedures.

112.  In discriminating against people with disabilities and preventing physical and program access to the Capitol, by failing to provide alternate formats of meeting agendas and other distributed materials for the blind, and failing to provide American Sign Language interpreters and CART which prevent people who are deaf and hard of hearing from being in complete isolation, Defendants have failed to comply with the Tex.Hum.Res. Code §121.003(d)(3), which requires the provision of auxiliary aids and services necessary to allow the full use and enjoyment of the public facility.

113.  Chapter 121 provides for a penalty of $100 to an aggrieved party for each violation of the law, for which Defendants are liable to Plaintiffs as a result of the allegations herein. Tex.Hum.Res. Code §121.004(a).

INJUNCTION

114. Plaintiffs and others with physical disabilities will continue to experience unlawful discrimination as a result of Defendants' wilful violations of, and failures to comply with, the ADA, Section 504, Chapter 121, and Article 9102.

115. Plaintiff and others with physical disabilities will suffer irreparable harm if injunctive relief is not granted. As such, injunctive relief is necessary to order Defendants to accommodate Plaintiffs and other persons with disabilities, so they can fully use and enjoy Defendants' facility and programs, as required by law.

DECLARATORY JUDGMENT

116. Plaintiffs are entitled to a declaratory judgment concerning Defendants' violations of the ADA, Section 504, Chapter 121, and Article 9102, as set forth above, and further specifying their rights to access to the Capitol and all services located therein.

ATTORNEY'S FEES AND COSTS

117. Plaintiff is entitled to reasonable attorney's fees, litigation costs, and court costs, as allowed by the ADA, 42 U.S.C. §1988, and the Texas Declaratory Judgment Act.

PRAYER FOR RELIEF

Plaintiff therefore respectfully requests that the Court:

A. Issue a permanent injunction to Defendants, including its agents, servants, and employees, and all persons in active concert with them, directing that all barriers to access at the Capitol, including all services located therein, be immediately removed, and forever enjoin Defendants from further discriminating against Plaintiff and others with physical disabilities, in violation of the ADA, Section 504, Chapter 121, and Article 9102;

B. Enter a declaratory judgment, specifying Defendants' violations of the ADA, Section 504, Chapter 121, and Article 9102, and declaring Plaintiffs' rights to unfettered access to the Capitol, including all services located therein;

C. Award Plaintiffs actual and/or statutory damages in the amount of $100 per violation of

the Chapter 121 of the Texas Human Resources Code;

D.   Order Defendants to pay Plaintiffs' attorney's fees, litigation expenses, and costs; and,

E.   Grant such other and additional relief to which Plaintiffs may be entitled.

Dated: August 1̲2̲t̲h̲, 2003.

Respectfully submitted,

_____

James C. Harrington
State Bar No. 09048500
Sheri Joy Nasya Tolliver
State Bar No.   24028050

TEXAS CIVIL RIGHTS PROJECT
1405 Montopolis
Austin, Texas 78741-3438
  (512) 474-5073 [telephone]
  (512) 474-0726 [facsimile]

ATTORNEYS FOR PLAINTIFFS